**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| DAVID A. ROOKS, | CASE NO. 3:20-cv-02858 |
| Plaintiff, | DISTRICT JUDGE DAVID A. RUIZ |
| vs. | MAGISTRATE JUDGE AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

Plaintiff David A. Rooks ("Plaintiff" or "Mr. Rooks") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner") denying his application for Supplemental Security Income ("SSI").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge pursuant to Local Rule 72.2.  For the reasons set forth below, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

## I.  Procedural History

On May 16, 2016, Mr. Rooks protectively filed an application for SSI.  (Tr. 16, 37,192, 373-80.)  Mr. Rooks initially alleged disability as of February 1, 2014, but later amended his alleged onset date to May 16, 2016.[1]  (Tr. 16, 53-54, 90, 373, 506.)   He asserted he was disabled due to renal mass on his kidneys, two bulging discs, two cracked vertebrae, bipolar disorder, apnea, and dislocated shoulder.  (Tr. 132-33, 141, 221, 226, 415.)  Following denial of his

---

[1] Since Mr. Rooks' amended alleged onset date of May 16, 2016 post-dated his June 30, 2014 date last insured, he was not entitled to a period of disability and disability insurance benefits under Title II of the Social Security Act. (Tr. 16, ECF Doc. 13 pp. 1-2, ECF Doc. 14 p. 1, n. 2.)

application at the initial level (Tr. 221-23) and upon reconsideration (Tr. 226-31), he requested a hearing.  (Tr. 234.)  Thereafter, a hearing was held before an Administrative Law Judge ("ALJ") on June 15, 2018.  (Tr. 85-131.)

On September 7, 2018, the ALJ issued a Notice of Decision – Unfavorable.  (Tr. 193-215.)  Mr. Rooks requested review of the decision by the Appeals Council, and on August 13, 2019, the Appeals Council remanded the decision to clarify how amending the alleged onset date to May 16, 2016 affected the claim for disability insurance benefits and to clarify the effect the assessed limitations had on the claimant's occupational base.  (Tr. 216-20.)

Upon remand, a different ALJ held a hearing. (Tr. 46-82.)  On April 24, 2020, the ALJ issued an unfavorable decision, finding Mr. Rooks had not been under a disability from May 16, 2016 through the date of the decision.  (Tr. 13-44.)  Mr. Rooks requested review of the decision. (Tr. 367-70.)  The Appeals Council denied Mr. Rooks' request for review on November 6, 2020, making the ALJ's April 24, 2020 decision the final decision of the Commissioner.  (Tr. 1-7.)  Mr. Rooks filed the present appeal on December 30, 2020.  (ECF Doc. 1.)

## II. Evidence

Although the ALJ identified multiple severe physical and mental impairments (Tr. 20), Mr. Rooks' challenge in this appeal relates to the ALJ's evaluation of evidence relating to his left hand and arm impairments, and the extent to which the ALJ accounted for those impairments in the residual functional capacity.  (ECF Doc. 13 pp. 5, 11-15.)  The evidence summarized herein is accordingly focused on evidence pertaining to Mr. Rooks' left upper extremity impairments and related limitations.

A.      **Personal, Educational, and Vocational Evidence**

Mr. Rooks was born in 1979.  (Tr. 35, 90.)  He attended college and earned a medical

assistant phlebotomy certificate.  (Tr. 93.)   He served in the United States Army.  (Tr. 94, 96.)

He also worked as a commercial roofer and for a cleaning and restoration company.  (Tr. 95.)

B.      **Medical Evidence**

1.      **Treatment History**

On January 25, 2016, Mr. Rooks saw Nurse Practitioner Tamara Bumpus at the Mildred

Bayer Clinic for a new patient visit.  (Tr. 892.)  He reported no injury but complained of left

shoulder pain that had been occurring for five years, explaining that his shoulder had been

"popping out."  (*Id*.)   He reported limited range of motion in the shoulder and instability with

movement.  (Tr. 894.)  He also complained of back pain, a lump under the back of his ear, night

sweats, and panic attacks.  (Tr. 892, 894.)  There was no swelling, tenderness, or deformity

observed during a musculoskeletal examination.  (Tr. 893.)  He was referred for x-rays of the left

shoulder and lumbar spine, and was started on ibuprofen 800 mg for his lumbar pain.  (Tr. 894.)

The x-rays were taken that same day, and showed the following:

- lumbar x-ray – minimal curvature of the lumbar spine convex to the right,
  possibly due to muscle spasm;

- left shoulder x-rays – negative shoulder series; no fractures, no dislocations,
  acromioclavicular joint intact, and adjacent bony and soft tissue structures
  unremarkable.

(Tr. 944, 946.)

Mr. Rooks returned to see NP Bumpus on February 2, 2016.  (Tr. 888.)   Physical

examination findings were unmarkable.  (Tr. 889.)   Mr. Rooks continued to report left shoulder

3

dislocation with use and low back pain. (*Id.*) NP Bumpus referred him to orthopedics for his shoulder and ordered a lumbar MRI for his back pain. (*Id.*) A lumbar MRI on February 3, 2016 showed a minimal disc bulge with superimposed small central and right paracentral disc protrusion at L3-4, but no significant spinal canal stenosis or neural foraminal narrowing in the lumbar spine. (Tr. 943.)

On October 18, 2016, Mr. Rooks presented to Promedica Toledo Hospital with complaints of numbness and weakness in the left side of his face and left upper and lower extremities. (Tr. 578.) He reported the numbness and weakness started around two in the morning, along with a headache. (*Id.*) He also reported being unable to make a grip with his left hand. (*Id.*) On examination, Mr. Rooks was in no acute distress, with no edema in the extremities, and subtle left-sided facial droop. (Tr. 579.) He was able to lift his left arm, but unable to provide any resistance, and was able to lift lower extremities against gravity, but unable to provide resistance due to worsening back pain when trying to resist movement. (*Id.*) He had normal light touch sensation in all extremities. (*Id.*) A CT scan of the head showed no evidence of intracranial hemorrhage, low-attenuation lesions, or acute pathology. (Tr. 578, 579.) There was concern for cerebrovascular accident because of the facial droop, weakness, and numbness. (Tr. 579.) MRIs, an echocardiogram, EEG, blood work, MRA of the head and neck, and neurology consult were recommended and ordered. (Tr. 558, 579.) He was admitted for further evaluation. (Tr. 557-58, 575-77.)

The EEG showed some mild diffuse slowing and disorganization, and mild cerebral dysfunction, but no evidence of epileptic activity. (Tr. 558.) The lumbar spine MRI showed minimal degenerative disease. (*Id.*) MRIs of the thoracic spine, cervical spine, and brain were negative or showed no abnormalities. (*Id.*) Mr. Rooks was diagnosed with left-sided

paresthesia with some associated headaches, with a notation that neurology felt it was less likely a TIA, and was discharged on October 23, 2016.  (Tr. 557.)  He was also diagnosed with Vitamin B12 deficiency, history of headaches, suspected syncope and some atypical chest pain.  (Tr. 557.)  He was instructed to follow up with his primary care physician.  (Tr. 557, 576.)

Mr. Rooks saw Ionel Welt, M.D. with The Toledo Clinic – Family Practice of Welt & Welt on October 24, 2016 to establish care as a new patient.  (Tr. 842.)  He reported being discharged from the hospital the previous day after suffering a stroke, with reported numbness and weakness in the left side of his body.  (*Id*.)  He said he was scheduled to see cardiology and neurology.  (*Id*.)  Examination findings were normal.  (Tr. 843.)  Mr. Rooks was diagnosed with cerebrovascular accident (CVA), unspecified mechanism and left-sided numbness and weakness.  (Tr. 843-44.)  Dr. Welt instructed him to follow up with cardiology and neurology.  (Tr. 844.)

On November 10, 2016, Mr. Rooks saw Rachel Marie Van Niel, ACNP-BC, at The Toledo Clinic – Neurology Main Campus for follow up regarding his left-sided numbness and weakness.  (Tr. 662.)  He indicated he was having residual headaches, blurred vision, left-hand weakness, and left-sided numbness from head to hip since his hospital discharge.  (Tr. 663.)  On examination, Mr. Rooks appeared uncomfortable but was in no acute distress.  (Tr. 663.)  He demonstrated a full range of motion and motor strength in the neck, with: left-sided neck muscle tension; normal posture; decreased left hand grip with decreased wrist flexion; decreased left hand sensation to light touch, temperature, and vibration; left hand swelling; normal finger-nose-finger coordination on right but ataxic on left; normal tandem and heel and toe walking; and negative Romberg test.  (Tr. 663-64.)  On cranial nerve testing, NP Van Niel observed his sternocleidomastoid and trapezius strength was reduced on the left.  (Tr. 664.)  Mr. Rooks was

referred for an MRI to assess his left-handed weakness and paresthesia.  (Tr. 662.)  Physical therapy was also recommended.  (*Id*.)

Mr. Rooks returned to see NP Van Niel on December 2, 2016.  (Tr. 766.)  He reported that his left leg weakness had resolved, but continued to report weakness, numbness, and tingling in his left hand, daily tension-type headaches, near syncope symptoms but no syncope since his October 2016 hospitalization, and chronic left shoulder pain.  (Tr. 767.)  He indicated he had previously planned to undergo shoulder surgery, but it was canceled when it was discovered that he had renal cell carcinoma.  (*Id*.)  Examination findings were similar to the November 10, 2016 examination findings, but with decreased left-hand swelling.  (*Compare* Tr. 663-64 *with* Tr. 767-68.)  NP Van Niel noted the left brachial plexus MRI was pending relative to left-hand weakness, and indicated Mr. Rooks should continue taking gabapentin for his paresthesia.  (Tr. 766.)

Mr. Rooks saw Ashok Salvi, M.D., at The Toledo Clinic – Advanced Pain Management Main Campus as a new patient on December 15, 2016 for back, hip, leg, neck, and shoulder pain and left upper extremity pain and numbness.  (Tr. 822.)  His examination showed: mild tenderness over the spinous process; normal range of motion of the cervical spine; antalgic gait; left-sided upper and lower extremity weakness; left-sided facial weakness; brisk reflexes on the left side; positive facet loading; peripheral pulsations; 5/5 muscle power in sternocleidomastoid; and no edema in the extremities.  (Tr. 823-24.)  Dr. Salvi reviewed a lumbosacral spine MRI, and noted it showed a bulge at L3-L4, without stenosis or neural compromise but with mild facet arthropathy.  (*Id*.)  Physical therapy was planned.  (*Id*.)  Surgical intervention for the back was ruled out, but epidural injections were recommended.  (*Id*.)

On January 10, 2017, Mr. Rooks saw Dr. Welt for follow up regarding multiple medical conditions, which were reported to be stable.  (Tr. 747.)  He denied neck or back problems and

joint pain or weakness, but complained of right elbow pain and was interested in a cortisone shot to help with the pain.  (Tr. 747-48.)  Examination findings were normal, including normal motor strength in the upper and lower extremities.  (Tr. 749.)  Mr. Rooks' diagnoses included right lateral epicondylitis (tennis elbow) and neuropathy.  (*Id*.)  Dr. Welt refilled Mr. Rooks' gabapentin for his neuropathy and administered a Depo-Medrol with Lidocaine injection in the right elbow.  (Tr. 749-50.)

The previously ordered MRI of the brachial plexus was performed on February 3, 2017, and was negative for abnormalities (Tr. 793.)  On February 15, 2017, Mr. Rooks had an EMG of his left upper extremity.  (Tr. 913-15.)  The EMG study was normal, showing no evidence of radiculopathy, brachial plexopathy, nerve entrapment, or peripheral neuropathy.  (Tr. 914.)

Mr. Rooks saw Dr. Salvi and John Rohr, PA-C on February 21, 2017 for follow up.  (Tr. 807.)  Mr. Rooks requested and Dr. Salvi ordered a cane to help with walking.  (Tr. 807, 808.)  On examination, Mr. Rooks had tenderness in the neck and spine, with slight wasting in the left lower extremity, reduced motor strength (4/5) and sensation in the left upper and lower extremities, and an inability to grip with his left hand.  (Tr. 809.)  Mr. Rooks was continued on Percocet.  (Tr. 807.)  Dr. Salvi planned to start prescribing Neurontin (gabapentin) in place of Dr. Welt, and noted that Mr. Rooks would be following up with neurology.  (Tr. 807.)

On March 2, 2017, Mr. Rooks saw Ted Barber, M.D. at The Toledo Clinic – Neurology Main Campus.  (Tr. 800.)  Mr. Rooks reported that he continued to have left-hand weakness.  (*Id*.)  Dr. Barber reviewed the results of the EMG that was performed on February 15, 2017, noting that the study was normal.  (*Id*.)  Dr. Barber explained to Mr. Rooks that the most likely cause of his left-hand weakness was his stroke.  (*Id*.)  Mr. Rooks told Dr. Barber that he could not start occupational or physical therapy for his stroke until after his scheduled left-shoulder

surgery.  (*Id*.)  He was to start therapy for both his shoulder and hand after his shoulder surgery.

(*Id*.)  A neurological examination showed poor strength and range of motion in the left-side

extremities, with the hand more affected than the arm, and the arm more affected than the leg.

(*Id*.)  Sensory examination was diminished to major modalities on the left, and coordination

testing was diminished on the left.  (Tr. 800-01.)  Dr. Barber recommended follow up in six

months.  (Tr. 800.)

Mr. Rooks saw Dr. Salvi on March 20, 2017, complaining of pain primarily in his low

back bilaterally and neck.  (Tr. 798.)  The pain did not radiate into his legs, but he complained of

numbness in his left leg that he attributed to his stroke.  (*Id*.)  On examination, Mr. Rooks

exhibited tenderness in the spine, an antalgic gait, and reduced sensation in the left lower

extremity.  (Tr. 799.)  Nevertheless, straight leg raise was negative, there was no wasting or

edema in the extremities, and motor strength was 5/5 in the bilateral lower extremities.  (Tr.

799.)  Mr. Rooks' Percocet was continued, and his Neurontin was increased.  (Tr. 797.)

Mr. Rooks sought emergency room treatment on April 10, 2107 at Mercy St. Vincent

Medical Center, approximately one week after being involved in a car accident.  (Tr. 917.)   He

reported chest and neck pain that was radiating into his sternum and worsening since the

accident.  (*Id*.)  He also reported that the numbness in his left arm associated with a prior stroke

was worse that day.  (*Id*.)  An examination was normal, including normal range of motion and no

edema or tenderness, and the work up was negative.  (Tr. 920, 923.)  Mr. Rooks was discharged

with a diagnosis of chest pain and instructed to take ibuprofen 800 mg as needed for pain and

follow up with his primary care physician.  (Tr. 923.)

Mr. Rooks saw Dr. Salvi and Stacey Ice, NP-C on April 18, 2017 for follow up regarding

his chest, back, shoulder, and neck pain.  (Tr.  1013, 1015.)  He continued to report numbness in

his left leg.  (Tr. 1015.)  An examination showed: tenderness over the cervical spine, paraspinal muscles, and trapezius muscles; moderate range of motion in the lumbar spine; slight tenderness over the anterior chest wall; tenderness over the midline lumbar spine, lumbar paraspinal muscles, and sacroiliac joints; positive straight leg raise on left; slight wasting in the left lower extremity but no edema; antalgic gait with use of a cane; reduced (4/5) motor strength and sensation in the left lower and upper extremity. (Tr. 1015-16.)  Mr. Rooks was continued on Percocet and gabapentin.  (Tr. 1013.)

Mr. Rooks continued seeing Dr. Salvi for follow-up visits in May and June 2017.  (Tr. 1005-09, 1010-12.)  During a July 17, 2017 follow-up visit with Dr. Salvi, Mr. Rooks reported pain in his low back, neck, and left shoulder, radiating into his bilateral buttocks.  (Tr. 1000, 1002.)  He indicated that his pain was worse since suffering a fall two weeks earlier.  (Tr. 1002.)  He reported his pain medication helped reduce his pain to a 4/10 for four hours, but requested an injection because his pain was worse since the fall.  (*Id*.)  Dr. Salvi's notes reflect that Mr. Rooks was seeing an orthopedist regarding his left hip.  (Tr. 1000.)  Mr. Rooks was planning to follow up with Dr. Assenmacher regarding left shoulder surgery, which had been cancelled in the past.  (Tr. 1000-01.)  Dr. Salvi scheduled a caudal injection.  (Tr. 1001.)

Mr. Rooks saw Dr. Welt on July 18, 2017 for a three-month follow-up visit.  (Tr. 995.)  He reported back problems but denied neck problems, painful joints, or weakness, and indicated that his conditions were stable with no medication side effects.  (Tr. 995, 996.)  Examination findings were normal.  (Tr. 997.)  Dr. Welt refilled Mr. Rooks' medications.  (Tr. 998.)

In September 2017, Dr. Salvi administered a caudal epidural injection for Mr. Rooks' low back pain.  (Tr. 991.)  Mr. Rooks followed up with Dr. Salvi and NP Ice on October 10, 2017.  (Tr. 987-90.)  He reported that his pain was in the cervical and lumbar regions and the left

shoulder, but did not radiate into his lower or upper extremities.  (Tr. 989.)  He reported that his

pain medications reduced his pain to a 7-8/10 for four hours, and that the caudal injection

worsened his pain.  (*Id*.)  He wanted to discuss other options and needed a refill on his Percocet.

(*Id*.)  On examination, he demonstrated mild-to-moderate cervical range of motion limitations

and tenderness over the midline cervical spine.  (Tr. 990.)  He also displayed moderate lumbar

range of motion limitations, positive lateral facet loading, and tenderness over midline lumbar

spine and bilateral lumbar paraspinal muscles.  (*Id*.)  He exhibited a positive straight leg raise for

lumbar pain, but demonstrated: no wasting or edema in the extremities; 5/5 motor strength in the

bilateral upper and lower extremities; and grossly intact sensation.  (*Id*.)

In November 2017, Mr. Rooks fell while walking his dog and sustained a right ankle

fracture.  (Tr. 1073.)  He received treatment at the University of Toledo Medical Center for the

injury.  (Tr. 1073-1095.)  He was discharged home with his ankle splinted.  (Tr. 1084, 1086.)  He

subsequently underwent an open reduction and internal fixation of the right distal fibula fracture

and syndesmotic on November 17, 2017 with Nail Ebraheim, M.D. at the University of Toledo

Medical Center.  (Tr. 1041, 1060.)  On November 23, 2017, Mr. Rooks saw Dr. Ebraheim for

right ankle pain.  (Tr. 1041-42.)  His ankle was re-splinted, and he was provided crutches for

ambulation and instructed to remain non-weightbearing.  (Tr. 1042.)

He was later referred to physical therapy for his ankle pain and generalized muscle

weakness.  (Tr. 1101.)  Though approved for thirty physical therapy visits, Mr. Rooks attended

only three sessions and missed two sessions.  (Tr. 1101.)  He was discharged from physical

therapy on April 17, 2018 for lack of follow up.  (Tr. 1101-03.)   In the discharge paperwork, it

was noted that Mr. Rooks was non-ambulatory, and he did not ambulate with crutches or a

walker due to risk of left shoulder dislocation and upper extremity weakness.  (Tr. 1102.)

During an April 17, 2018 follow-up visit with Dr. Salvi, it was noted that Mr. Rooks had not yet had an EMG of his left lower extremity.  (Tr. 1131.)  He had also not yet followed up on getting a lumbar brace as previously ordered.  (*Id*.)  Dr. Salvi was prescribing Percocet fifteen days at a time.  (*Id*.)  Mr. Rooks still planned to see Dr. Assenmacher regarding left shoulder surgery, but reported it was put on hold due to his recent right lower extremity surgery.  (*Id*.)  Mr. Rooks complained of cervical, lumbar, shoulder, and ankle pain (Tr. 1133.)  On examination, he exhibited reduced lumbar and cervical range of motion, tenderness in the cervical and lumbar regions, bilateral facet loading, antalgic gait, and bilateral acromioclavicular and subacromial tenderness.  (Tr. 1134.)  He demonstrated no wasting or edema in the extremities, and 5/5 motor strength, but wore an orthopedic boot on his right foot.  (*Id*.)

During a June 12, 2018 visit with Dr. Salvi, examination revealed: mild cervical range of motion limitations but no cervical or trapezius tenderness; moderate-to-severe lumbar range of motion limitations; positive straight leg raise on the left, with no lumbar or SI tenderness; non-tender left shoulder; edema in the right lateral ankle; antalgic gait; reduced sensation in the upper and lower left extremities; 5/5 motor strength in the left lower extremity but 4/5 motor strength with grip and extension of elbow in the left upper extremity.  (Tr. 1180.)  Dr. Salvi continued Percocet and gabapentin.  (Tr. 1178-79.)

Mr. Rooks saw Dr. Salvi again on July 10, 2018 for a one-month follow up regarding his neck, back, and bilateral leg pain.  (Tr. 1198-1202.)  He also complained of pain in his right ankle, left shoulder, and his right wrist.  (Tr. 1198.)  He thought his wrist pain was related to use of his cane, and he reported that his pain medication reduced his pain to 8-9/10 for four hours.  (*Id*.)  He requested a refill of his Percocet and reported his orthopedist felt that his right ankle was sufficiently healed to clear him for lumbar injections.  (*Id*.)  On examination, he continued to

11

exhibit reduced cervical and lumbar range of motion and tenderness in the cervical and lumbar regions.  (Tr. 1200.)  Straight leg raise was positive bilaterally and his gait was antalgic.  (*Id.*)  His motor strength was reduced (3/5) in the left upper extremity but normal in the left lower extremity.  (*Id.*)  There was reduced sensation in the left upper extremity and left thigh.  (*Id.*)  Dr. Salvi continued Mr. Rooks' medications, ordered a right wrist injection, and instructed him to follow up in one month.  (Tr. 1200-01.)

On the same date, Mr. Rooks was evaluated by Benjamin Assenmacher, M.D. at the Promedica Physicians Orthopaedics Center for his left shoulder.  (Tr. 1223.)  He complained of left shoulder instability, frequent popping, and mild pain.  (*Id.*)  He also reported that a prior stroke had affected his left upper extremity, primarily in his hand, and that his shoulder problem had taken a "back seat so to speak in terms of treatment" because of other medical issues, including his stroke and renal cell carcinoma.  (*Id.*)  He was seeking an evaluation and treatment because his shoulder was getting progressively worse.  (*Id.*)  On examination, Mr. Rooks' left rotator cuff was intact but there was very mild rotator cuff weakness with supraspinatus external rotation manual muscle testing.  (Tr. 1224.)  There was "negative drop-arm," but crepitation in the shoulder throughout range of motion, positive posterior load shift, positive O'Brien test, pain in the shoulder joint with cross-body abduction, mild laxity with sulcus maneuver, mild apprehension with abduction and external rotation, and laxity with anterior and posterior drawer test.  (*Id.*)  There was no AC joint pain, no erythema or effusion, and the long head of the biceps was intact and non-tender.  (*Id.*)  Dr. Assenmacher ordered an MRI arthrogram of the left shoulder.  (Tr. 1225.)

Mr. Rooks had the MRI arthrogram on August 10, 2018 (Tr. 1203-07) and followed up with Dr. Assenmacher on August 14, 2018 to review the results (Tr. 1225-27).  The MRI

suggested a SLAP (posterior and anterior labral) tear and Type III acromion process.  (Tr. 1207, 1227.)  After discussing treatment options, arthroscopic left shoulder surgery was scheduled. (Tr. 1227.)  On August 27, 2018, Mr. Rooks underwent arthroscopic left shoulder surgery performed by Dr. Assenmacher.  (Tr. 1228-30.)

Mr. Rooks saw Dr. Assenmacher for a post-surgical visit on September 11, 2018.  (Tr. 1230.)  He reported doing "very well," noting that his arm was primarily in a sling without active or passive range of motion, but reported using his left arm more than he probably should for daily hygiene and activities.  (*Id*.)  Dr. Assenmacher referred Mr. Rooks to physical therapy.  (Tr. 1231.)  He attended physical therapy from October 2018 through January 2019, when he was discharged due to poor attendance. (Tr. 1231, 1239-54, 1349-51.)  He attended five sessions following his initial evaluation and missed nine.  (Tr. 1349.)  He reported he wanted to be done with physical therapy and would return if needed.  (*Id*.)

The record also reflects that Mr. Rooks was receiving pain management treatment at Toledo Pain Services, PLL for back pain with radiculitis from December 2018 through September 2019.  (Tr. 1262-73, 1389-1418.)  He was treated by J. Gao, M.D.  (*Id*.)  Treatment included pain medication and lumbar epidural steroid injections, medial branch blocks, and radio frequency ablation.  (Tr. 1265, 1269, 1391, 1396, 1403, 1413, 1418.)

On March 28, 2019, Mr. Rooks saw Dr. Welt for medication refills, at which time he reported Dupuytren contraction of his left hand and that he was unable to fully extend any of his fingers.  (Tr. 1364.)  He denied focal weakness in his upper and lower extremities but reported numbness and tingling.  (Tr. 1364, 1366.)  Mr. Rooks' musculoskeletal examination was normal, except he was unable to fully extend his fingers due to Dupuytren contracture.  (Tr. 1366.)  There was no edema in the extremities, his gait was normal, and motor strength in the upper and lower

13

extremities was normal.  (*Id.*)  Dr. Welt referred Mr. Rooks to orthopedic surgery for the diagnosis of Duypuytren contracture.  (Tr. 1368.)  In treatment notes from an August 22, 2019, office visit with Dr. Welt, it was noted that Mr. Rooks was "followed by Dr. Hartwig" relative to his Dupuytren contracture.  (Tr. 1359.)  Mr. Rooks does not cite to, and the record does not appear to contain, treatment records from Dr. Hartwig.  During the hearing in February 2020, Mr. Rooks acknowledged having been referred to an orthopedic surgeon for his hand, stating it was because "they found something growing in the middle of [his] hand," but said he had not yet followed up to address it.  (Tr. 70.)

### 2.    Opinion Evidence

#### a.    Dr. Benjamin S. Assenmacher, M.D.

On December 4, 2018, Dr. Assenmacher from Promedica Physicians Orthopedics authored a letter, stating that Mr. Rooks had a diagnosis of "nontraumatic type 1 superior labrum extending from anterior to posterior (SLAP) lesion of left shoulder."  (Tr. 1261.)  He opined that Mr. Rooks should remain on light duty status until January 31, 2019, which would include the ability to lift ten pounds or less and no repetitive overhead lifting with the left arm.  (*Id.*)

#### b.    State Agency Medical Consultants

On initial review, on September 8, 2016, state agency medical consultant Dimitri Teague, M.D. reviewed the file but concluded there was insufficient evidence and provided no physical RFC assessment.  (Tr. 33, 135-36, 137.)

On reconsideration, on February 1, 2017, state agency medical consultant Maureen Gallagher, D.O., M.P.H., reviewed the file and provided her opinion as to Mr. Rooks' physical RFC.  (Tr. 33, 158-60.)  She opined that Mr. Rooks had the following exertional limitations:

- lift and/or carry up to twenty pounds occasionally and ten pounds frequently;

- stand and/or walk about six hours in an eight-hour workday;

- sit about six hours in an eight-hour workday; and

- limited ability to push and/or pull with the left upper extremity.

(Tr. 159.)  She opined that Mr. Rooks had the following postural limitations:

- never climb ladders, ropes, or scaffolds;

- occasionally climb ramps or stairs; and

- frequently balance, stoop, kneel, crouch, or crawl.

(*Id*.)  Dr. Gallagher found no manipulative, visual, or communicative limitations, but opined that
Mr. Rooks would need to avoid all exposure to hazards, unprotected heights, open machinery,
and commercial driving.  (Tr. 159-60.)  Dr. Gallagher explained that the opined limitations were
due to degenerative disc disease and neuropathy.  (*Id*.)

## C.     Testimonial Evidence

### 1.     June 15, 2018 Administrative Hearing

Mr. Rooks testified in response to questioning by the ALJ and his representative at the
June 15, 2018 hearing.  (Tr. 90-124.)  He testified that as a result of the cerebrovascular accident
in October 2016, which he understood was a stroke, he has experienced left-sided numbness in
his face, arm, and hand.  (Tr. 107.)  He reported that his facial droop and numbness improved a
lot, but he still has problems using his left arm and no control over his left hand.  (*Id*.)  He also
indicated that his left leg was numb from his hip to mid-shin.  (*Id*.)  He testified to being able to
push and pull with his right arm and possibly pull with his left arm, but said he could not use his
left arm to control things or pick things up because it was numb.  (Tr. 118-19.)  He stated he
could not lift or carry any amount of weight, and could not reach overhead with his left arm

because his shoulder would come out.  (Tr. 119.)  He testified to being able to use his right arm,

hand, and fingers to reach, grasp, and manipulate objects, but not his left.  (Tr. 120.)

### 2.    February 13, 2020 Administrative Hearing

#### i.  Plaintiff's Testimony

Mr. Rooks testified in response to questioning by the ALJ and his representative at the

February 13, 2020 hearing.  (Tr. 58-71.)  He testified to being right-handed.  (Tr. 60.)  He

reported not driving because he lost his license for non-payment of child support, and because

his back issues and anxiety made riding in cars difficult.  (Tr. 70-71.)

Mr. Rooks reported being unable to work because of his back, his inability to bend or

stand for long periods, and his inability to lift over his head or physically pick up anything

weighing over five pounds.  (Tr. 62.)  He also reported being unable to work due to his mental

conditions, which included PTSD, bipolar disorder, and memory issues.  (Tr. 62.)  He reported

being unable to cook, mop, sweep, do dishes, or do laundry, stating "I only got one hand and I

can't stand and push a broom or a mop because of my back.  I can't do my laundry because of

the lifting and bending."  (Tr. 65.)  He also added that he could not push or pull, bend, sit, or

stand for more than a few minutes at a time.  (*Id*.)  He reported that he did not use his phone or

social media often because it was hard for him to use with one hand.  (Tr. 66.)

Mr. Rooks further testified that his left arm and hand were inoperable.  (Tr. 67.)  He

reported being unable to make a fist with his left hand, and being unable to fully straighten the

fingers on his left hand.  (*Id*.)  He also reported having no feeling in his left hand, and not being

able to pick things up with his left hand.  (Tr. 68.)  He indicated that he could not lift his left arm

past a certain point, even after his left shoulder surgery, explaining that he could not wash his

own hair and had a lot of pain in his shoulder all the time.  (Tr. 68-69.)  He reported he could lift

his left arm out to the side, but not without "crunching [and] cracking."  (Tr. 69.)  He testified

that he could only reach his left arm out in front of him for a couple of seconds before it started

to hurt.  (*Id*.)  He acknowledged being referred to an orthopedic surgeon for his hand because

"they found something growing in the middle of [his] hand," but said he had not yet followed up

or addressed it.  (Tr. 70.)

### ii.  Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the February 13, 2020 hearing.  (Tr. 71-79.)

Without objection from claimant's counsel, the ALJ informed the VE that she was adopting the

past relevant work from the prior hearing which included: soldier, very heavy exertion, semi-

skilled job; slitter operator, medium exertion, semi-skilled job performed at very heavy exertion;

roofer, medium exertion, skilled job performed at very heavy exertion; and commercial cleaner,

heavy exertion, unskilled job performed at very heavy exertion.  (Tr. 59, 72.)  The ALJ then

asked the VE to assume a hypothetical individual of Mr. Rooks' age, education, and relevant

vocational background who could perform:

> light work except, there's a lot so, he could occasionally use right and left hand and
> foot controls.  He could do no overhead reaching and reach in all other directions
> with both arms frequently and he can handle and finger and feel with both hands
> frequently.  He can occasionally climb ramps and stairs, never climb ladders, ropes
> or scaffolds and can occasionally balance and stoop and never kneel, crouch or
> crawl.  In addition, he can never work around hazards such as unprotected heights
> or around moving dangerous mechanical parts.  He can never operate a motor
> vehicle.  He can never work in conditions of humidity and wetness and extreme
> heat or cold and conditions where there is concentrated vibrations and in conditions
> where there's concentrated exposure to dust, odors, fumes or other pulmonary
> irritants.  He is also limited to performing simple, routine and repetitive tasks but
> not a production-rate pace.  For example, no assembly-line work.  He is limited to
> simple work-related decisions and he can respond appropriately to occasional
> interaction with supervisors and coworkers, but with no team or tandem work with
> coworkers and no interaction with the general public.  Finally, he's limited to
> tolerating few changes in the work setting defined as routine job duties that remain
> static and are performed in a stable, predictable work setting.  Any necessary
> changes need to occur infrequently and be adequately and easily explained.  He

>requires a cane for -- to ambulate.  He must also change positions every 30 minutes
>for one to two minutes in the immediate vicinity of the work station while
>remaining on task 95% of the time.

(Tr. 72-73.)   Based on the stated hypothetical, the ALJ asked whether the described individual

could perform Mr. Rooks' past work, and whether there was any other work that could be

performed.  (Tr. 73.)  In response, the VE testified that the described individual would not be

able to perform Mr. Rooks' past work or any other light jobs.  (Tr. 73-74.)

For her next hypothetical, the ALJ asked the VE to assume all the limitations contained in

the first hypothetical but to assume the individual had the ability to perform sedentary rather than

light work.  (Tr. 74.)  The VE explained that the described individual could not perform Mr.

Rooks' past work, but that there were sedentary unskilled jobs that the individual could perform,

including address clerk, document preparer, and sorter.  (*Id*.)  The VE testified that his response

to the sedentary hypothetical would not change if the individual was limited to no binocular

vision or tasks requiring depth perception.  (Tr. 77-79.)

The ALJ asked the VE questions across all exertional levels, first asking whether there

would be jobs available if an individual was limited to one hand for all work.  (Tr. 75.)  The VE

testified that in his opinion, such a limitation would be work preclusive.  (*Id*.)  The VE testified

that needing to lie down during the workday outside of normal work breaks would also be work

preclusive, and that being off task ten percent or more of the workday and missing one or more

days monthly on an ongoing, unplanned basis would be work preclusive.  (Tr. 75-77.)  The VE

also testified that a limitation of occasional handling, fingering, and feeling with one or both

hands would be work preclusive, noting there are exceptions to the rule but that the occupational

base for those would be "reduced upwards" to ninety-eight percent.  (Tr. 76.)

### III. Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is

capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 416.920;  *see also Bowen v. Yuckert*, 482 U.S. 137, 140–42, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In her April 24, 2020 decision, the ALJ made the following findings:[2]

1.  The claimant meets the insured status requirements through June 30, 2014. (Tr. 19.)

2.  The claimant has not engaged in substantial gainful activity since May 16, 2016, the amended onset date.  (Tr. 20.)

3.  The claimant has the following severe impairments: 2 cm right posterior renal mass status post partial nephrectomy; left shoulder degenerative joint disease; displaced bimalleolar fractures of the right lower extremity, status post-surgery; mild lumbar degenerative disc disease; migraines; right lateral epicondylitis; Dupuytren contracture of left hand; and mental impairments variously described as bipolar disorder, posttraumatic stress disorder, depression, and alcohol abuse.  (*Id.*)

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments.  (Tr. 20-23.)

5.  The claimant has the RFC to perform sedentary work except: he can occasionally use right and left hand controls, and occasionally use foot controls; he can do no overhead reaching and reach in all other directions with both arms frequently, and can handle, finger and feel with both hands frequently; he can occasionally climb ramps and stairs; he can never climb ladders, ropes, or scaffolds; he can occasionally balance and stoop; he can never kneel, crouch, or crawl; he can never work around hazards such as unprotected heights or around moving dangerous mechanical parts; he can

---

[2] The ALJ's findings are summarized.

never operate a motor vehicle; he can never work in conditions of humidity and wetness, in extreme heat or cold, in conditions where there are concentrated vibrations, and in conditions where there is concentrated exposure to dust, odors, fumes, or other pulmonary irritants; he requires a cane to ambulate; he must also change positions every thirty minutes for one to two minutes in the immediate vicinity of the workstation; he is limited to jobs that do not require binocular vision; he is also limited to performing simple, routine and repetitive tasks, but not at a production rate pace (for example, no assembly line work); he is limited to simple work-related decisions, and he can respond appropriately to occasional interaction with supervisors and coworkers, but with no team or tandem work with coworkers, and no interaction with the general public; he is limited to tolerating few changes in the work setting, defined as routine job duties that remain static and are performed in a stable, predictable work setting; and any necessary changes need to occur infrequently, and be adequately and easily explained. (Tr. 23-35.)

6.     The claimant is unable to perform any past relevant work. (Tr. 35.)

7.     The claimant was born in 1979 and was 34 years old, defined as a younger individual age 18-44, on the alleged disability onset date.  (*Id*.)

8.     The claimant has at least a high school education and is able to communicate in English.  (*Id*.)

9.     Transferability of job skills is not material to the determination of disability. (*Id*.)

10.    Considering the claimant's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that the claimant can perform, including address clerk and document preparer.  (Tr. 35-36.)

Based on the foregoing, the ALJ determined that Mr. Rooks was not disabled based on the SSI application filed on May 16, 2016.  (Tr. 37.)

### V. Plaintiff's Arguments

Mr. Rooks argues that the ALJ's RFC finding is not supported by substantial evidence because the ALJ failed to adequately account for limitations associated with impairments in his left upper extremity.  (ECF Doc. 13 pp. 11-15.)

21

## VI. Law & Analysis

**A.    Standard of Review**

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r Of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)); *see also Blakley*, 581 F.3d at 406.  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"  *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007), citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004)).

**B.      Assignment of Error: Whether RFC Limitations Relating to Left Upper Extremity Impairments Were Supported by Substantial Evidence**

Mr. Rooks' sole argument on appeal is that the RFC is not supported by substantial evidence because the ALJ did not adequately account for work-related limitations caused by impairments in his left arm and hand.  (ECF Doc. 13 pp. 11-15.)  In response, the Commissioner argues that the RFC accounts for all limitations that the ALJ found to be credible, including those associated with Mr. Rooks' left upper extremity impairments, and that the decision is supported by substantial evidence.  (ECF Doc. 14 pp. 9-13.)

A claimant's "residual functional capacity is the most [he] can still do despite [his] limitations."  20 C.F.R. § 416.945(a)(1).  "The responsibility for determining a claimant's residual functional capacity rests with the ALJ, not a physician."  *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) (citing See 20 C.F.R. §§ 404.1546(c), 416.946(c)).  An ALJ assesses a claimant's "residual functional capacity based on all the relevant evidence in [the] case record."  20 C.F.R. § 416.945(a)(1).  "[A]n ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding."  *Poe*, 342 Fed. App'x at 157.

Here, the ALJ found Mr. Rooks had the RFC to perform a reduced range of sedentary work.  (Tr. 23.)  By definition, sedentary work "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools."  20 C.F.R. § 416.967(a).  The ALJ also included the following additional upper extremity limitations:

- can occasionally use right and left hand controls;

- can do no overhead reaching;

- can frequently reach in all other directions with both arms;

- can frequently handle, finger, and feel with both hands.

(Tr. 23.)

In asserting that this RFC is not supported by substantial evidence, Mr. Rooks acknowledges that the RFC does contain limitations relating to the left upper extremity, but argues the limitations are not enough because "[t]he longitudinal record does not support a finding that Mr. Rooks is capable of frequently fingering, feeling and handling with his left hand." (ECF Doc. 13 pp. 12-13.)  He also asserts that the ALJ erred because she "failed to provide a specific reason why evidence from treating providers regarding the significant physical impairment of the left hand were not accepted or incorporated into the RFC" and failed to discuss her basis for rejecting evidence indicating that Mr. Rooks was unable to use his left hand. (*Id*. at pp. 12-13.)

The Commissioner asserts that the ALJ considered the entirety of the record and formulated an RFC that is supported by substantial evidence, including the objective evidence as well as medical opinion evidence.  (ECF Doc. 14 pp. 9-14.)  She also contends that Mr. Rooks failed to meet his burden of demonstrating "that the severity and functional impact of his left-hand impairment required limitations beyond those assigned in the ALJ's RFC." (ECF Doc. 14 p. 10.)  Because there is no evidence that the ALJ failed to consider the entirety of the record, the Commissioner contends that Mr. Rooks' argument "is nothing more than an improper invitation for this Court to reweigh the evidence." (*Id*. at p. 12.)

The ultimate issue before this Court is whether the ALJ's determination that Mr. Rooks had the RFC to frequently handle, finger, and feel with his left hand, as opposed to more reduced manipulative functioning, is sufficiently explained by the ALJ and supported by substantial evidence.   Integral to that determination is the general principle that: "'The substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go

either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  This is because it is not for this Court to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Indeed, this Court cannot overturn the decision in this case "so long as substantial evidence also supports the conclusion reached by the ALJ," even if a preponderance of evidence supports Mr. Rooks' position. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003); *Blakley*, 581 F.3d at 406 ("[I]f substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'") (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

In support of his assertion that the record supports more restrictive manipulative limitations, Mr. Rooks relies largely on his own testimony regarding left hand function.  (ECF Doc. 13 p. 14.)  A review of the ALJ's decision makes clear that she considered those subjective statements, as well as the medical records and opinion evidence relevant to his left upper extremity impairments, in making her decision.  (Tr. 24-29, 32-33.)  Based upon the evidence, she found severe impairments that included left shoulder degenerative joint disease and Dupuytren contracture of the left hand.  (Tr. 20.)  Upon review of the record, she concluded that Mr. Rooks' subjective allegations regarding the severity of his impairments and the limiting effects of his symptoms were not entirely consistent with the record evidence.  (Tr. 34.)  She listed several grounds for finding the subjective allegations not entirely consistent with the record (Tr. 34-35) and Mr. Rooks has not directly challenged her evaluation of his subjective allegations in this appeal.

While Mr. Rooks contends that the ALJ erred because she "failed to provide a specific reason why evidence from treating providers regarding the significant physical impairment of the left hand were not accepted or incorporated into the RFC," he does not clearly identify what evidence he alleges the ALJ failed to accept or incorporate into the RFC.  (ECF Doc. 13 pp. 12-13.)  He simply refers to "observations made by more than one treating clinician [] that Mr. Rooks cannot close his hand to form a fist and he had lost all grip strength in the left hand."  (*Id.* at p. 13.)  An independent review of the medical records and the ALJ decision does not support Mr. Rooks' argument that the ALJ ignored evidence from treating providers.  On the contrary, the ALJ clearly detailed Mr. Rooks' medical treatment records relating to his reported pain and problems with his left upper extremity.  (Tr. 25-29.)

Specifically, the ALJ acknowledged objective findings of "some weakness in the left upper extremity" in October 2016 (Tr. 26 (citing Tr. 557)), "decreased motor strength in the left upper extremity, with associated decreases in sensations to heat and vibrations" in November 2016 (*id.* (citing Tr. 663-64)), "diminished sensations" in the left upper extremity in December 2016 (*id.* (citing 768)), normal examination findings in January 2017 (Tr. 27 (citing 749)), "reduced motor strength in the left upper and lower extremity with associated reductions in sensation over the left lower and upper extremity" and "difficulties with grip strength in the left hand" in February 2017 (*id.* (citing Tr. 809)), "mild evidence of weakness in the left upper and lower extremity" in April 2017 (Tr. 28 (citing Tr. 1016), positive findings in a July 2018 left shoulder examination (Tr. 29 (citing Tr. 1224)), and a July 2018 MRI of the left upper extremity revealing "a labral tear and Type III acromion" (*id.* (citing Tr. 1237-38)) followed by shoulder surgery and post-operative physical therapy (*id.*).  The ALJ also acknowledged a February 2017 MRI of the left brachial plexus that "was negative for abnormalities (Tr. 26 (citing Tr. 793)) and

a February 2017 EMG of the left upper extremity that "failed to show any evidence of electrodiagnostic abnormalities (Tr. 27 (citing Tr. 800)).

In addition, the ALJ considered relevant medical opinion evidence in assessing the left upper extremity limitations, including the opinion of the only treating provider who offered an opinion regarding Mr. Rooks' left upper extremity function.  (Tr. 32.)  In his December 4, 2018 opinion, Dr. Assenmacher opined that Mr. Rooks should remain on light duty through the end of January 2019, with an ability to lift ten pounds or less but no overhead lifting with the left arm. (Tr. 1261.)  The ALJ assigned Dr. Assenmacher's opinion significant weight, explaining that she found it consistent with the claimant's treatment notes at Promedica Physicians Group, as well as records from the Toledo Clinic, which showed that Mr. Rooks had "a history of right lateral epicondylitis and left shoulder degenerative joint disease with Dupuytren contraction in the left upper extremity."  (Tr. 32.)

The ALJ also considered the opinion of Dr. Gallagher, a state agency medical consultant, who reviewed the file at the reconsideration level on February 1, 2017 and opined that Mr. Rooks could lift and carry twenty pounds occasionally and ten pounds frequently, and had limited use of his left upper extremity for pushing and pulling due to degenerative disc disease and neuropathy, but had no manipulative limitations.  (Tr. 33, 183-85.)  The ALJ assigned significant weight to Dr. Gallagher's opinion, finding it was "generally consistent with the treatment notes from … the Toledo Clinic, and the Comprehensive Center for Pain Management, which show that [Mr. Rooks] has a significant history of … chronic pain secondary to back impairments, bilateral upper extremity impairments, and right ankle injury."  (Tr. 34.)

The opinions cited by the ALJ provide additional evidence in support of the left upper extremity limitations in her RFC, and Mr. Rooks does not identify any medical opinion evidence

that supports additional left upper extremity limitations.  Indeed, the left upper extremity limitations adopted by the ALJ were more restrictive than any medical opinion of record.  (Tr. 23-24.)  Based on her review of the medical opinions and the evidentiary record as a whole, the ALJ adopted restrictive upper extremity limitations that included: sedentary exertional lifting and carrying requirements with no overhead reaching bilaterally (consistent with Dr. Assenmacher's temporary light duty restrictions), occasional use of bilateral hand controls (consistent with Dr. Gallagher's recommendation for limited pushing and pulling with the left upper extremity), and additional limitations to no more than frequent reaching in other directions, and no more than frequent handling, fingering, and feeling.  (*Id*.)

While Mr. Rooks correctly notes that there are abnormal findings relating to his left upper extremity impairments, such as reduced strength and grip and diminished sensation in the left upper extremity (Tr. 664, 768, 809), the undersigned has detailed above ALJ's explicit consideration of evidence documenting reduced strength and other abnormal findings pertaining to the left upper extremity.  The ALJ also considered other evidence of record suggestive of fewer limitations including normal motor strength in the bilateral upper extremities (Tr. 990, 1134) a brachial plexus MRI that was negative for abnormalities (Tr. 793), and normal EMG of the left upper extremity (Tr. 800, 914)).  While the ALJ did not explicitly identify every piece of objective evidence suggesting left upper extremity weakness or limitation, she was not required to do so.  *See Boseley v. Comm'r of Soc. Sec.*, 397 F. App'x 195, 199 (6th Cir. 2010) (An ALJ is not "required to discuss each piece of data in [her] opinion, so long as [she] consider[s] the evidence as a whole and reach[es] a reasoned conclusion.") (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507–08 (6th Cir. 2006) (per curiam)).

28

The undersigned finds that the ALJ did not omit discussion of any material evidence, and that the findings cited and discussed by the ALJ are generally consistent with the remaining evidence of record relating to Mr. Rooks' left upper extremity limitations.

In addition to finding that the ALJ accurately summarized the objective, subjective, and opinion evidence, the undersigned further finds that the evidence as a whole provided substantial evidence in support of the relevant left upper extremity limitations.  While the record did reflect observations of reduced left upper extremity / grip strength, the level of limitation was largely vague or mild to moderate.  (*See, e.g.*, Tr. 664 ("decreased" grip), 749 (normal motor strength), 800 ("poor" strength), 809 (reduced 4/5 motor strength with inability to grip), 824 ("weakness" "to four over five"), 990 (5/5 strength), 990 (5/5 motor strength), 1016 (reduced 4/5 motor strength), 1134 (5/5 motor strength), 1180 (4/5 motor strength with grip and elbow extension), 1200 (reduced 3/5 motor strength), and 1366 (unable to fully extend fingers).)  The record also reflected, as discussed above, that related imagery was negative, with the exception of an MRI demonstrating a left shoulder condition that was corrected with surgery.  Considered in combination with the medical opinion evidence, the record contains substantial evidence to support the ALJ's finding that Mr. Rooks' left upper extremity impairments supported a limitation to no more than frequent handling, fingering, or feeling, but did not require more restrictive manipulative limitations.

In sum, Mr. Rooks has not met his burden to demonstrate that the ALJ's finding that Mr. Rooks has the RFC to frequently handle, finger, and feel with both hands falls outside of her "zone of choice."  The RFC limitations applied by the ALJ were consistent with the evidence and adequately supported by the decision, and were therefore supported by substantial evidence. While Mr. Rooks argues that the evidence supports a more restrictive RFC, it is not this Court's

role to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner*, 745 F.2d at 387.  Even if Mr. Rooks could show that a preponderance of evidence supports more restrictive manipulative limitations, this Court cannot overturn the Commissioner's decision because "substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477.

## VII. Recommendation

For the foregoing reasons, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

March 28, 2022

*/s/ Amanda M. Knapp*
AMANDA M. KNAPP
UNITED STATES MAGISTRATE JUDGE

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).